IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

MICHELLE HEBRON,
*Defendant.*

Criminal No.: ELH-08-086
**UNDER SEAL**

**MEMORANDUM OPINION**

Michelle Hebron was one of 28 defendants indicted in February 2008.  ECF 1.[1]  Hebron was charged in Count One with conspiracy to participate in racketeering activity, in violation of 18 U.S.C. § 1962(d).  Pursuant to a Plea Agreement (ECF 920), Hebron pled guilty to Count One on April 1, 2010.  ECF 915.  The Plea Agreement was tendered pursuant to Fed. R. Crim. P. 11(c)(1)(C), by which the parties agreed to a term of imprisonment ranging between 300 and 360 months.  ECF 920, ¶ 5.  At sentencing on June 23, 2010 (ECF 1021), Judge William D. Quarles, Jr., to whom the case was then assigned, found that Hebron's conduct established that he "murdered David Leonard Moore."  ECF 1765-4 (Sentencing Tr.) at 25.  The court sentenced Hebron to 360 months of imprisonment.  *See* ECF 1024 (Judgment).[2]  He is currently incarcerated at FMC Carswell.  *See, e.g.*, ECF 1765-7.

While self represented, Hebron filed correspondence seeking a sentence reduction, as well as relief under Section 404 of the First Step Act of 2018.  ECF 1616; ECF 1633.  Through

---

[1] The Motion states: "Inmate Michelle Hebron has a Case Management Activity ("CMA") assignment of transgender (female-to-male)." ECF 1762 at 1 n.1. The briefing uses male pronouns to refer to Hebron, and I do the same in this Memorandum Opinion. However, I sometimes cite to older documents that use female pronouns to refer to Hebron.

[2] The case was reassigned to me on January 29, 2016, due to the retirement of Judge Quarles. *See* Docket.

appointed counsel (*see* ECF 1655; ECF 1686), Hebron has filed a "Supplemental Memorandum in Support of Defendant's Motion for Compassionate Release Under 18 U.S.C. §3582(c)(1)(a)(i) and Sentence Reduction Under Section 404 of the First Step Act." ECF 1762. I shall refer to ECF 1616, ECF 1633, and ECF 1762 collectively as the "Motion." The Motion is supported by numerous exhibits. ECF 1765.

The government opposes the Motion (ECF 1819), and has filed exhibits. ECF 1819-1 to ECF 1819-3. Hebron has replied. ECF 1826 (the "Reply"). Hebron also provided an "updated summary" from a social worker who has been evaluating him. ECF 1828.

In ECF 1819, the government did not address the First Step Act. Therefore, the Court directed the government to do so. ECF 1865. Thereafter, the government filed a supplemental response indicating its position regarding Hebron's eligibility under § 404 of the First Step Act. ECF 1866. I shall refer to ECF 1819 and ECF 1866 collectively as the "Opposition." Hebron filed a supplemental reply. ECF 1869.

No hearing is necessary to resolve the Motion. For the reasons that follow, I shall deny the Motion.

## I. Factual Background[3]

### A.

On February 21, 2008, a grand jury in the District of Maryland returned a 20-count Indictment as to Hebron and 27 codefendants. ECF 1 (the "Indictment").[4] However, Hebron was named only in Count One, which charged conspiracy to participate in racketeering activity, in

---

[3] Some of the filings in the case predate electronic access. The first electronic filing appears on March 24, 2008, at ECF 238, but some filings after this date are still inaccessible.

[4] The Indictment is not available electronically, but a copy of the Indictment was docketed with the Motion. *See* ECF 1765-1.

violation of 18 U.S.C. § 1962(d).  ECF 1; *see* ECF 1765-1 at 2-29.

In particular, Count One alleged, *inter alia*, that Hebron was a member of Tree Top Piru ("TTP"), a "subset" or subdivision of the Bloods gang.  ECF 1765-1 at 3, 4-5, ¶¶ 2, 12.  According to the Indictment, Hebron and his codefendants conspired to conduct the affairs of TTP through a pattern of racketeering activity.  *Id*. at 8-10, ¶ 19.

Count One enumerated 117 overt acts in furtherance of the conspiracy.  *Id*. at 11-29, ¶ 25. With respect to Hebron, the Indictment alleged that he murdered David Leonard Moore; participated in the shooting of a TTP member who was believed to be cooperating with law enforcement; and communicated with, and provided funds to, codefendant Steve Willock, a TTP leader.  *Id*. at 15-23, ¶¶ 25(22), (23), (28), (31), (39), (83).  Other alleged overt acts of the conspiracy included the murders of Terrance Williams, *id.* at 11, ¶ 25(1), and Lamont Jackson, *id.* at 12, ¶ 25(3), and possession with intent to distribute and distribution of cocaine base, including at quantities of 50 grams or more.  *See, e.g.*, *id*. at 15-17, ¶ 25(24), (32), (34).

Other counts of the Indictment charged Hebron's codefendants with possession with intent to distribute and distribution of cocaine base under 21 U.S.C. §§ 841 and 846, as well as conspiracy to distribute and possess with intent to distribute, with some counts involving quantities of 50 grams of more.  *See id*. at 30-33, 35-36, 39, 41, 44-45, 47-48.  But, Hebron was not charged with any offense under 21 U.S.C. §§ 841 or 846, and none of the overt acts in Count One with respect to cocaine involved Hebron.

On April 1, 2010—the first day set for trial—Hebron entered a plea of guilty to Count One of the Indictment.  ECF 915.  As noted, the plea was entered pursuant to a Plea Agreement tendered under Fed. R. Crim. P. 11(c)(1)(C).  ECF 920.  The Plea Agreement listed the following elements of the offense to which Hebron agreed to plead guilty: that the criminal enterprise set out in the

Indictment existed; that the enterprise affected interstate or foreign commerce; that Hebron was associated with or employed by the enterprise; that the enterprise engaged in a pattern of racketeering activity; and that Hebron unlawfully, willingly, and knowingly conspired with two or more persons to conduct and participate in the affairs of that enterprise through a pattern of racketeering activity.  ECF 920, ¶ 2.

The Plea Agreement specified that the maximum statutory penalty was life imprisonment. *Id*. ¶ 3.  The parties agreed to a base offense level of 43, because Hebron's underlying racketeering activity involved first degree murder.  *Id*. ¶ 6(a). They also contemplated a two-level deduction for acceptance of responsibility, and a final adjusted offense level of 41.  *Id*. ¶ 6(b).  And, as mentioned, the parties stipulated to a term of imprisonment ranging between 300 and 360 months. *Id*. ¶ 9.

The Plea Agreement included a lengthy stipulation of facts.  *Id*. at 9-16.  The stipulation recounted the history, practices, and slang of TTP.  *Id*. at 9-11.  TTP originated in California as a subset of the Bloods gang, but later spread to other states, including Maryland.  *Id*. at 9.  In Maryland, TTP has its roots in a local gang named Trey 8, which began in the Washington County Detention Center in Hagerstown, Maryland in or about 1999.  *Id*.  In 2000, Trey 8 changed its name to "Insane Red Devils/Tree Top Piru," before making contact with TTP members from California in 2005, ultimately changing its name to TTP.  *Id*.  And, a group of female gang members formed a subset of TTP, known as Tree Top Pirettes.  *Id*.  In order to join TTP, potential members were required to complete an initiation process that sometimes involved "missions," meaning "violent acts such as robberies, assaults, or carjackings."  *Id*. at 11.

TTP, including its leadership, members, and associates, constituted an "enterprise" as defined in 18 U.S.C. § 1961(4), *i.e.*, "a group of individuals associated in fact that engaged in, and

4

the activities of which affected, interstate and foreign commerce." ECF 920 at 11. The purposes of this enterprise included "[p]reserving and protecting the power, territory and profits of the enterprise through the use of intimidation, armed robberies, violence, including assaults and murder, threats of violence, and narcotics trafficking;" promoting and enhancing the enterprise and the activities of its members and associates, both in and out of prison, through the use of intimidation, violence, threats of violence, and narcotics trafficking; keeping victims and potential victims in fear of the enterprise, and its members and associates, through violence and threats of violence; providing financial support and information to gang members, including those incarcerated for committing acts of violence or other offenses; and "[p]roviding assistance to other gang members who committed crimes for and on behalf of the gang in order to hinder, obstruct and prevent law enforcement from identifying," apprehending, trying, and punishing the offenders. *Id*. at 12.

Hebron, "a member of the TTP Bloods," together with others, did knowingly conspire to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise (*i.e.*, TTP) through a pattern of racketeering activity. *Id*. Hebron agreed that "a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise." *Id*.

The stipulation enumerated various examples of "gang-related communications" involving Hebron. *Id*. at 13; *see id*. at 13-14. These communications generally involved codefendant Steve Willock, a TTP leader. *Id*. at 9, 13-14. For example, in a letter to Willock postmarked April 21, 2007, Hebron referred to himself as "'the sharpest Tamu,'" meaning a female Bloods member, "'bred'" or initiated by Willock. *Id*. at 13. In a letter postmarked April 23, 2007, Hebron wrote to Willock asking for information, including Hebron's "'status and offisialness [sic], [his] rank and all of that,'" prior to Hebron going to "'hook up with [Hebron and Willock's] big homies in

5

bodymore.'"   ECF 920 at 13.  Hebron closed this letter by stating, *id*.: "'Yes, I kill, die, ride, live and bang for you 100%.'"  The next day, Hebron wrote to Willock to confirm TTP rules as Hebron understood them.  *Id*.  In a letter dated May 2, 2007, Willock wrote to Hebron, stating in part, *id*. at 14: "'You must remember it was me who asked you to come into my house of Trees.'"

On May 5, 2007, Hebron wrote to Willock, telling him, *id*.: "'Look, I'm ready to put in my work for the family and prove myself.'"  Hebron also asked Willock not to "'stop looking at'" Hebron "'as a potential leader.'"  *Id*.  On or about May 30, 2007, Hebron asked Willock for clarification as to colors worn by TTP, wrote that he expected to be appointed TTP leader in Annapolis, and stated, *id*.: "'Sure murder is necessary but positivity is powerful. . . . . I will chew a nig** up [then] go to McDonald's and eat a double cheese burger like it's nothing you dig.'"

In a letter dated June 25, 2007, Hebron told Willock that he had just returned from a meeting of TTP members.  *Id*.  And, in a letter postmarked January 7, 2008, Hebron asked Willock if it was true that if a name is not on the lease of an apartment, "'they can't charge you with sh**?'"  *Id*.  He also stated that law enforcement was "'trying to make it seem'" that he was renting an apartment and living there based on mail that had been found, and mentioned that law enforcement "'found the petaroll [*i.e.*, murder] platinum [*i.e.*, handgun] too.'"  *Id*.  In addition, from around November 9, 2006, through in or about October 16, 2007, Hebron, along with three other codefendants, provided $1,435 to Willock.  *Id*.

According to the stipulation, the government would present evidence that members of TTP frequently engaged in acts of violence, including murders, assaults, robberies, kidnappings, and threatening and intimidating witnesses.  *Id*. at 15.  Moreover, TTP members were required to commit acts of violence to maintain membership and discipline within the gang and against rival gangs.  *Id*.  Participation in criminal activity, especially violent acts directed at rival gangs or as

directed by gang leadership, increased the respect accorded to a member, resulted in that member maintaining or increasing his position in the gang, and could result in promotion to a leadership position.  ECF 920 at 15.

Further, the government indicated that it would present evidence concerning the murder of David Leonard Moore on October 5, 2007, described below.  *Id.* at 15-16.

On or about October 5, 2007, officers and detectives of the Hagerstown Police Department responded to 101 East Avenue in Hagerstown, for a report of an unresponsive gunshot victim.  *Id.* at 15.  When officers arrived on the scene, "they found a black male wearing a blue shirt lying at the base of the stairs leading to the second floor of the apartment building."  *Id.*  The man, who was later identified as Moore, had been shot once in the head.  *Id.*  He was pronounced dead at the scene, and an autopsy determined the cause of death was a gunshot wound to the head, "with the manner of death being homicide."  *Id.*  It was later determined that Hebron lived at "Apartment 3" at 101 East Avenue.  *Id.*

A witness to the shooting identified Hebron in a photo array as the person who shot Moore. *Id.*  According to the witness, after Hebron shot Moore, Hebron stated, *id.*: "'That's what the crab [a reference to a member of the rival Crips gang] gets.'"  The witness stated that after the shooting, he want back into Apartment 3 with Hebron, and observed Hebron tuck the gun into a rip in the couch's fabric.  *Id.*  The witness noticed that Hebron changed clothes and washed his hands with "some type of cleaner."  *Id.*  Another witness said that she received a text message from Hebron on October 5, 2007, at approximately 6:45 p.m.  *Id.*  The text stated, *id.*: "'If your [sic] asked you took me down last night and brought back 2day.'"  This witness also recounted that Hebron admitted to her, either the day of or the day after the shooting, that he (*i.e.*, Hebron) "'shot a nig**.'"  *Id.*

On October 10, 2007, a search warrant was executed at 101 East Avenue, Apartment 3. ECF 920 at 15.  During the search, a loaded .380 Davis Industries Model P380 pistol was located. *Id*.  The pistol was test fired, and it was determined that both the test fired cartridge cases and a cartridge case recovered from the scene of the shooting were fired from the P380 pistol recovered from Hebron's apartment.  *Id*.  The test fired bullets and a bullet recovered from Moore were likewise determined to be from this P380 pistol.  *Id*.

A handwritten note was also located in Apartment 3.  *Id*.  This note had handwriting similar to those in the letters written by Hebron to Willock.  *Id*. at 15-16.  The note stated, *id*. at 16: "'Red robins flyin round my head nig** goin brazy [sic] I guess just shot a nig** in the head cause he wear blue but claim red/plus I just wanted the satisfaction of seein a nig** dead.'"

Beginning approximately two weeks after Hebron entered his guilty plea, Hebron wrote a series of letters to Judge Quarles, seeking to withdraw the plea.  ECF 1031 at 3-4.[5]  In the letters, Hebron asserted that his counsel had "lied" to him regarding the sentencing range, and that he had reviewed a document with a different range.  *Id*.  Hebron stated that he thought his sentencing range would be between 200 and 260 months, rather than between 300 and 360 months.  *Id*. at 3. At sentencing on June 23, 2010, Judge Quarles denied Hebron's request.  ECF 1765-4 at 11.  In a subsequent written Memorandum Opinion (ECF 1031), Judge Quarles explained that Hebron had not offered credible evidence that his plea was not knowing and voluntary, nor had he asserted actual innocence.  *Id*. at 4-5.

As noted, sentencing was held on June 23, 2010.  ECF 1021.  At the time, Hebron was 25

---

[5] The letters do not appear to have been docketed. *See* Docket.

years old.  ECF 1765-5 (Hebron Presentence Report or "PSR") at 1.[6]  Under § 2E1.1 of the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), the base offense level for conspiracy to participate in a racketeering enterprise is 19, or the offense level applicable to the underlying racketeering offense.  ECF 1765-5, ¶ 40.  Consistent with the Plea Agreement, the PSR reflected first degree murder, in violation of 18 U.S.C. § 1111, as the underlying racketeering activity, with a base offense level of 43, pursuant to U.S.S.G. § 2A1.1.  *Id*. ¶¶ 40, 41.  However, contrary to the Plea Agreement, the PSR awarded Hebron four deductions for acceptance of responsibility under U.S.S.G. § 3E1.1, rather than two, yielding a final offense level of 39.  *Id*. ¶¶ 47, 50, 51.[7]

The PSR reflected six adult criminal convictions, of which five scored points.  *Id*. ¶¶ 60-69.  These offenses are discussed below.

In 2003, Hebron was found guilty in the District Court for Anne Arundel County of making a false statement to an officer, and received a time-served sentence of one day.  *Id*. ¶ 60.  Hebron was 18 years old at the time of the offense, and no points were scored for this offense.  ECF 1765-5, ¶ 60.  In 2004, Hebron pled guilty in the Circuit Court for Anne Arundel County to unauthorized use of a motor vehicle, and was sentenced to one year of imprisonment with credit for time served, plus two years of probation.  *Id*. ¶ 61.  Hebron was found guilty in 2005 of violating his probation, and a one-year sentence was imposed, with credit for previous time served.  *Id*.

---

[6] Defendant has docketed a copy of the revised PSR, to which I cite.  *See* ECF 1765-5.  It was revised on June 23, 2010, the date of sentencing.  *See id*. at 2.

[7] At sentencing, the government noted that Hebron appeared to have received deductions for acceptance of responsibility twice.  ECF 1765-4 at 3.  But, Judge Quarles commented, *id*. at 4: "I have had several conversations with [the Probation Officer], who is an expert in these matters, and he has persuaded me that it was properly calculated, that what appears to be a double counting is actually sort of an artifact of the anomaly that usually the Chapter 4 adjustments create a larger final offense level than the one before the Chapter 4 enhancements."

Also in 2004, Hebron was found guilty in the District Court for Anne Arundel County of malicious destruction and trespass on private property. ECF 1765-5, ¶ 63. He received a total sentence of 90 days suspended, and one year of probation. *Id*. Defendant was found guilty of violating probation in 2005, for which he received an 80-day sentence of imprisonment. *Id*.

In 2005, defendant pled guilty in the Circuit Court for Anne Arundel County to wearing, carrying, and transporting a handgun upon his person, as well as to resisting arrest. *Id*. ¶ 64. He received a three-year sentence of incarceration for the firearm offense, and a 12-month consecutive sentence, suspended, was imposed for resisting arrest. *Id*. Hebron was also placed on three years of probation. *Id*. The same year, defendant was found guilty in the Circuit Court for Anne Arundel County of second degree assault, for which he received a sentence of six-months of incarceration. *Id*. ¶ 66. Finally, in 2007 defendant was found guilty in the District Court for Anne Arundel County of theft less than $500, for which he received a suspended 18-month sentence. *Id*. ¶ 68.

One of defendant's four juvenile adjudications also scored points. *Id*. ¶ 58. Specifically, defendant was charged in the Juvenile Court for Fairfax County, Virginia, with possession of a controlled dangerous substance (PCP and marijuana). *Id*. In October 2001, Hebron appeared in court, at which time the proceeding was continued and he was ordered to complete drug treatment. *Id*. However, in October 2002, Hebron failed to appear in court or provide proof of treatment. *Id*. Thereafter, in December 2002, the court entered a conviction for both counts. *Id*.

These criminal convictions yielded a subtotal criminal history score of 11. *Id*. ¶ 70. Two points were added because, at the time the instant offense was committed, Hebron was on probation for the resisting arrest and theft convictions discussed above. *Id*. ¶ 71. And, another point was added because the instant offense was committed less than two years after defendant's release from custody for the handgun offense. *Id*. ¶ 72. This resulted in a total criminal history

10

score of 14 points, yielding a criminal history category of VI.  ECF 1765-5, ¶ 73.

The PSR originally classified Hebron as a career offender, based on his convictions for resisting arrest and second degree assault, as described above.  *Id*. ¶¶ 41, 78.  However, this had no effect upon his offense level or criminal history category, because his offense level was already above 37, and his criminal history category was already VI.  *See id*.  In any case, at sentencing, defense counsel argued that second degree assault was not a qualifying offense for career offender status.  Judge Quarles rejected the career offender designation, without objection from the government.  ECF 1765-4 at 7-8.

The PSR noted that the maximum statutory sentence was life imprisonment, pursuant to 18 U.S.C. §§ 1962(d) and 1963.  ECF 1765-5, ¶ 81.  According to the PSR, the Guidelines range for a "total offense level of 38" and a criminal history category of VI was a term of imprisonment of 360 months to life.  *Id*. ¶ 82.[8]  As noted, in the Plea Agreement, the parties stipulated to a sentence of between 300 and 360 months of imprisonment.  *Id*. ¶ 109; ECF 920, ¶ 9.

Defendant is 5'3" and, at sentencing, weighed approximately 165 pounds.  ECF 1765-5, ¶ 96.  Defendant described his physical health as "'good,'" but mentioned that he has asthma, for which he used a prescription inhaler, as needed.  *Id*.  He also reported that he had been shot in the right leg as a teenager during his involvement in an armed robbery offense, causing chronic pain and weakness.  *Id*.

Hebron also stated that he began consuming alcohol at age 11 and drank alcohol "'every other day.'"  *Id*. ¶ 98.  He also advised that he had started abusing marijuana on a daily basis when

---

[8] It is unclear why the PSR mentions a total offense level of 38 in this paragraph. The report otherwise references a total offense level of 39 (*see* ECF 1765-5, ¶ 51), and the Statement of Reasons also reflects a total offense level of 39. *See* ECF 1025 at 1. In any case, the Guidelines range is the same for an offense level of 38 or 39 with a criminal history category of VI: 360 months to life.

he was 11, and began abusing PCP and ecstasy at age 15.  ECF 1765-5, ¶ 99.  In 2009, Hebron received his GED while incarcerated.  *Id.* ¶ 101.

Defendant reported a "very difficult childhood."  *Id.* ¶ 89.  His parents were drug abusers. *Id.* ███████████████████████████████████████████████████████ ████████████  Defendant reported the abuse to his mother, and the perpetrator was arrested and prosecuted.  *Id.*  At age eight, Hebron was removed from the custody of his parents, and thereafter lived with his grandmother, and then in several group homes, foster homes, and "institutional placements."  *Id.*

Hebron reported that as a juvenile, he was diagnosed with ███████████, and was hospitalized on two occasions in Anne Arundel County.  *Id.* ¶ 93.  He recalled that he was treated with a number of medications for his ██████████, but was not taking any as of sentencing.  *Id.* Defendant's grandmother confirmed Hebron's ████████ diagnosis.  *Id.* ¶ 90.  In addition, the PSR indicated that in 2000, while Hebron was at the Waxter Children's Center, Hebron underwent a psychological evaluation, "at which time [he] was diagnosed as follows: ██████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ¶ 95.

At sentencing, the government sought a sentence at the "top end" of the C plea range.  ECF 1765-4 at 11.  Defense counsel sought a sentence of 25 years of imprisonment.  *Id.* at 16.  Counsel asked Judge Quarles "not to rely on the murder," noting that the stipulation of facts in the Plea Agreement was "carefully drafted" such that Hebron only agreed that the government would present the enumerated evidence as to the killing of Moore.  *Id.* at 16-17.  Defense counsel also highlighted the results of the psychiatric evaluation of Hebron, performed by Dr. Mario Gomez,

at defense counsel's request, and by Order of the Court.  *Id.* at 18-20; *see* ECF 994; ECF 998.[9]

According to counsel, Dr. Gomez diagnosed Hebron with 

. Hebron's uncle, Warren Hebron, and

David Moore's father also gave statements to the Court.  *Id.* at 12-16, 22-25.

Judge Quarles imposed a sentence of 360 months, or 30 years, with credit dating from

October 9, 2007.  ECF 1024 (Judgment) at 2.  That sentence was the maximum contemplated by

the Plea Agreement.  *Id.*  Explaining his sentence, Judge Quarles stated, ECF 1765-4 at 27:

> Ms. Hebron is a 25-year-old, I guess former member of the TTP Bloods gang set, whose admitted conduct establishes that she murdered David Leonard Moore, whom she believed to be a Crips member or affiliate. Ms. Hebron's criminal history includes convictions for car theft, carjacking, firearms possession, assaults, and thefts. This criminal conduct is perhaps, to use a word of [defense counsel], contextualized, explained by a difficult childhood, ▇▇▇▇▇▇▇▇ I note at least one bright spot in that she did manage to obtain her GED while she was incarcerated.
>
> Upon reflection, her criminal history establishes a guideline range of 360 months to life. I do believe that a sentence at the bottom of the guidelines, at the top of the (c) plea range negotiated by the parties, is sufficient but not greater than necessary to reflect the seriousness of the offense, provide just punishment, afford deterrence, and protect the public from further criminal conduct of the Defendant, and, although a Federal medical facility is not the best place for providing medical and psychiatric care, the sentence at least will attempt to accomplish that objective.

Hebron appealed the judgment.  ECF 1056.  In August 2011, the Fourth Circuit affirmed

the conviction and sentence in an unpublished, per curiam opinion.  ECF 1222; *see United States*

*v. Hebron*, 442 Fed. App's 887 (4th Cir. 2011).  Specifically, the Fourth Circuit rejected Hebron's

arguments that Judge Quarles abused his discretion by failing to conduct a competency hearing,

accepting defendant's guilty plea, and denying defendant's attempt to withdraw his guilty plea.

442 Fed. App'x at 888-93.  The Fourth Circuit denied a petition to rehear en banc.  ECF 1230.

---

[9] Dr. Gomez's report has not been provided to the Court. Current defense counsel attempted to obtain a copy of the report, but was unable to do so. ECF 1762 at 4 n.3.

Hebron subsequently moved, pro se, to vacate his conviction under 28 U.S.C. § 2255. ECF 1276; ECF 1278. By Memorandum Opinion (ECF 1337) and Order (ECF 1338) of April 15, 2013, Judge Quarles denied the motion, and declined to issue a Certificate of Appealability. Judge Quarles also denied a successive § 2255 motion filed by Hebron. *See* ECF 1416; ECF 1417. Hebron did not appeal the § 2255 rulings.

**B.**

As noted, Hebron is currently incarcerated at FMC Carswell. *See, e.g.*, ECF 1765-7; *see also Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited July 27, 2022). He has a projected release date of September 22, 2034. ECF 1765-6 at 3. With credit for pretrial detention dating from October 9, 2007, Hebron has served about 178 months of his 360-month sentence, or approximately 50%.

In large part, the Motion is premised on Hebron's mental health condition. The Motion describes Hebron as having a "long history of mental and emotional health issues that require a level of specialized treatment and clinical support." ECF 1762 at 9. However, the Motion contends that the Bureau of Prisons ("BOP") is not providing Hebron with adequate treatment. In particular, the Motion criticizes BOP for placing Hebron "at the lowest level of mental health care" and disregarding his "longstanding diagnosis for ███████████████████." *Id.*; *see also id.* at 11-13.[10] According to the Motion, *id.* at 26: "The BOP does not currently prescribe Mr. Hebron psychotropic medications. Neither does Mr. Hebron receive the level of specialized treatment and clinical support needed to effectively manage his mental health symptoms and decrease negative behaviors." These mental health issues and BOP's inadequate response, the

---

[10] The Motion explains, ECF 1762 at 14: "The BOP classification system has four levels [for mental health care]. Care level one inmates are the healthiest, with care level four being clinically insane."

Motion asserts, have contributed to Hebron's troubled disciplinary history, as well as his suicidal ideation. ECF 1762 at 9, 14-18. The Motion also contends that Hebron's transgender designation has exacerbated this situation, particularly as Hebron is housed in a female prison. *Id*. at 1, 9, 20. As discussed, *infra*, some of these circumstances appear to have changed since the Motion was originally filed.

The Opposition offers a lengthy response as to the Motion's mental health argument. ECF 1819 at 7-23. The government acknowledges that Hebron "clearly has significant mental health needs." *Id*. at 9. However, the government asserts, *id*. at 8-9: "The BOP records show extensive efforts by the BOP to address the defendant's needs in a medically responsible and professional way, and to set the defendant's care level based on what has been appropriate for the defendant at each stage of his treatment." The Opposition describes BOP's care as extensive and reasonable, and disputes the claims in the Motion as to faulty care. *Id*. at 9-15. The government also asserts that Hebron's BOP-diagnosed mental health condition ███████████████████ is characterized by difficulty with complying with rules; that Hebron has refused to cooperate with BOP's efforts at treatment, and has a history of reporting suicidal ideation when he is dissatisfied with his treatment; and that Hebron's mental health condition reflects both a danger to the community and a strong risk of recidivism if defendant were released. *Id*. at 7-8, 16-23.

Defendant responded to the government's claims in his reply. ECF 1826. He criticizes BOP's general record of providing inmates with mental health care. *Id.* at 1-8.

Defendant's BOP mental health records are included with the Motion. *See* ECF 1765-10. The records reflect a mental health evaluation of Hebron conducted on February 1, 2021, as a result of his referral for possible placement in the secure administrative unit at FMC Carswell. *Id.* at 127-33. The evaluation found that Hebron met the criteria for ████████████████.

ECF 1765-10 at 133. And, the evaluation contained the following "Summary-Case Formulation," *id.* at 132-33:



 a suicide risk assessment was conducted because Hebron reported "thoughts of self-harm." *Id.* at 111.[11] The record includes the following summary of defendant's mental health history, *id.*:



---

[11] The Court generally cites to the most recent medical records provided to the Court.

███████████████

The assessment recounted that Hebron "has been evaluated for suicide risk approximately 52 times and placed on suicide watch approximately 15 times since his incarceration in 2010," and had last been placed on suicide watch in May 2020. ECF 1765-10 at 111. Moreover, Hebron "attempted to hang himself in November 2012 at FCI Dublin." *Id.* But, the suicide risk assessment concluded that placement on suicide watch was not warranted at the time. *Id.* at 112.

In particular, the assessment indicated that there was "no evidence to suggest recent thoughts of self-harm or suicidal ideation." *Id.* Furthermore, Hebron's mood and affect were within normal limits, his grooming and hygiene were appropriate, and there was no evidence of psychotic symptoms. *Id.* at 112. And, the assessment also noted, *id.* at 111: "Mr. Hebron often reports suicidal ideation and intent in an attempt to modify the conditions of his confinement."

The Motion also contains a biopsychosocial evaluation and recommended treatment plan, dated August 18, 2021, prepared by Tonyah Roberts-Johnson, MSW, LCSW-C, a "Clinical/Forensic Social Worker" who assessed Hebron through virtual meetings. ECF 1765-8. Roberts-Johnson noted that Hebron had been without incident since November 2020, but remarked that he is "at great risk of deteriorating and regressing" without "proper clinical support." *Id.* at 3. Roberts-Johnson opined that Hebron "has been far from receiving the level of clinical support that he needs to sufficiently maintain his mental and emotional health," and that he "would most benefit from being placed at Care Level 2." *Id.* at 5. She concluded that Hebron should "be afforded an opportunity to receive the level of therapeutic care that he needs, and requires, to function in a positive and contributory manner," and recommended various steps upon his release, such as participation in an intensive outpatient mental health care program. *Id.* at 6-8.

Defendant also submitted an "updated summary" from Tonyah Roberts-Johnson, dated

17

February 8, 2022.  ECF 1828.  She discusses the progress Hebron has been making, *id.* at 1-2:

> Overall, Hebron remains receptive to clinical support from this writer, and the BOP clinical team with whom he is currently working with for the treatment and maintenance of his mental health needs. During my meetings with Hebron, he has been alert, oriented, open and forthcoming with information. Hebron has not presented as agitated or anxious. There were also no expressed thoughts of self-harm or suicidality, homicidal ideation, intent, or plan. Hebron's mood and affect were low at times but generally within normal ranges. There was no evidence of distorted thinking, delusions, audio or visual hallucinations or paranoia.
>
> Hebron reports being clinically stable with the exception of some days when he challenged with depressive symptoms or anxiousness. Hebron continues to use clinical tools such as reciting positive affirmations, deep breathing, meditation and self-talk to redirect his thoughts and decrease his symptoms. Hebron has relayed that he continues to self-regulate to avoid conflicts with inmates and correctional staff, and as a result, to date, Hebron reportedly remains without any incidents since November 2020.
>
> Hebron's efforts were recognized by BOP on December 13, 2021 when he was moved to Care Level 2 of the ADX program from Care Level 1, where he had been classified since December 2020. This transition resulted in Hebron being re-integrated into general population and permitted to participate in mental health groups. ████████████████████ to assist with regulating his mood, and he receives more routine clinical care, which have all aided Hebron with his goals of remaining mentally and emotionally stable, and without any behavioral issues. Hebron has been ecstatic about his overall progress inclusive of his ability to walk away from potential conflict with fellow inmates or correctional staff. Hebron expressed during one of our video meetings: "I want to show my greatness."
>
> Medically, Hebron is stable. He has offered no complaints. Hebron did share, however, that ████████████████████████████████████████ Hebron has also been successful at officially launching his new clothing line as a creative outlet and means to establish a source of income.

Of particular note, this summary indicates that several of the specific deficiencies asserted in the Motion as to Hebron's mental health treatment have been addressed.  Hebron has been moved from care level one to level two.  *Id.* at 1.  In addition, Hebron has resumed taking medication, and has received more routine clinical care.  ECF 1828 at 1.

However, Roberts-Johnson also states that "clinical concerns still remain for [Hebron's] unaddressed complex trauma and impaired cognition needs because the services that he is currently receiving do not fully and adequately address his therapeutic needs. *Id*. at 2. In her view, Hebron "would benefit more from an intensive therapeutic approach that includes a combination of treatment approaches . . . ." *Id*.

The government has submitted a Declaration from Jay A. Munneke, Psy.D., the Chief Psychologist at FMC Carswell. ECF 1819-3. ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████ Dr. Munneke states that based on Hebron's "mental status, level of functioning, and absence of psychological distress, a new Psychiatry medication consult is not clinically indicated." *Id*. ¶ 6. Furthermore, he opines that, "[b]ased on a review of available records and observation of the inmate's current functioning, there is no evidence to suggest Inmate Hebron currently suffers from ████████████████████ as described in the now obsolete Diagnostic and Statistical Manual of Mental Health Disorders (4th ed., Text Revision)." *Id*. ¶ 7.

Further, Dr. Munneke states: "In nearly every case [of Hebron being placed on suicide watch], the placement was prompted by interpersonal conflicts with staff or inmates and did not appear to be the result of acute mental illness." *Id*. ¶ 8. For example, in a "Suicide Watch Contact" record dated May 25, 2019, Hebron "acknowledged using a threat of suicide to manipulate conditions of confinement at times," although Hebron stated that was not what was occurring in that particular incident. ECF 1765-10 at 16.

According to Dr. Munneke, since Hebron's return to FMC Carswell, there has been no

evidence of symptoms associated with psychosis, no evidence of depressive or manic episodes in the past nine months, and "no other evidence of mental illness, suicidal ideation or intellectual disabilities." ECF 1819-3, ¶ 14.[12] He stated: "In closing, Inmate Hebron appears to be functioning well in this environment and is likely to continue to thrive in a structured, predictable, and supervised secure medical facility with on-going access to medical, psychological and educational support services." *Id.*

Based on Hebron's medical records, the Opposition asserts, ECF 1819 at 17: "It is well documented in the defendant's mental health records that he has a history of reporting suicidal ideation, violating rules, or otherwise acting out when he is dissatisfied with his housing or other treatment." *See also id.* at 17-19. And, the Motion concedes that Hebron "admittedly uses threats of suicide to obtain essential mental health services at times." ECF 1762 at 16; *see also id.* at 14 (stating that the asserted lack of adequate mental health treatment "prompts Mr. Hebron to verbalize suicidal ideation to modify his conditions of confinement").

Hebron also has a significant disciplinary record. Over the course of his incarceration, Hebron has accumulated more than 70 disciplinary infractions, beginning in 2010. *See* ECF 1765-9 (BOP disciplinary record). The most recent was in December 2020, for an assault without serious injury. *Id.* at 1. Other offenses include disruptive conduct, fighting, threatening bodily harm, possessing a dangerous weapon, being insolent to a staff member, refusing to obey an order, giving or accepting money without authorization, being absent from a work assignment or refusing work,

---

[12] Dr. Munneke refers to Hebron returning to FMC Carswell, but does not give a specific date for the return, nor mention the place where Hebron had been held. ECF 1819-3, ¶ 14. Citing medical records, the Motion states that Hebron transferred to FMC Carswell at some point between February 17, 2021, when he was apparently at FDC Houston, and March 30, 2021. ECF 1762 at 14 (citing ECF 1765-10 at 121, 123). A more specific date for the transfer has not been provided by the parties.

interfering with security devices, phone abuse, and more.  ECF 1765-9 at 1-21.

The Motion acknowledges this disciplinary history, but asserts that it is the result, at least in part, of inadequate mental health care.  ECF 1762 at 16.  It states, *id*.: "A contextualized assessment of these infractions shows that Mr. Hebron is not a danger to the public's safety or another person and is independently learning to redirect himself."

Defendant has also submitted the Affidavit of Jack Donson, the founder of "My Federal Prison Consultant."  *See* ECF 1765-20 (Donson Aff.).  The Motion describes Donson as a "nationally recognized expert on BOP policy and a retired BOP case manager."  ECF 1762 at 14. Donson states, ECF 1765-20, ¶ 11: "At first glance, the incident report history appears to be egregious but it should be understood in context. . . . Thirty-five of the reports are for high severity conduct, thirty-six are of the moderate severity and three are of the low severity.  Insolence and Refusing to Obey an order are the most common behaviors regarding the moderate conduct. There is only one greatest severity offense on file for the possession of a weapon which occurred in 2013."

Donson also addresses BOP's inmate profile for Hebron, which, according to Donson, indicates that he is "a high risk for recidivism."  *Id*. ¶ 18.  Donson explains that BOP's recidivism risk assessment tool, referred to as "PATTERN," assesses both an inmate's general risk and violent risk of recidivism.  *Id*.  He states: "The BOP profile only reflects the higher of the two scores and often the risk for violence recidivism is lower than the general risk."  *Id*.  Donson opines that he concurs with Hebron's high risk for general recidivism, but believes defendant's risk for violent recidivism is best calculated as "medium."  *Id*. ¶ 19.  He also states that this medium risk "is in the bottom range of the scoring range and will be near the threshold of 'low' risk in November 2021,"

if there are no additional incident reports.  ECF 1765-20, ¶ 20.[13]

Notably, both the government and defendant agree that defendant's mental health situation generally has improved since 2020.  In the Opposition, the government states, ECF 1819 at 15: "The defendant is participating in programming; he has not had disciplinary infractions; he is doing better since late 2020."  The government takes this improvement as an indication that BOP's approach to Hebron's mental health treatment is the correct one.  *Id*.  The Reply acknowledges that "Mr. Hebron has demonstrated a period of stability since November 2020 that confirms his commitment to treatment and rehabilitation," but it maintains that treatment concerns remain.  ECF 1826 at 5.

In October 2020, Hebron contracted COVID-19.  ECF 1765-17 (BOP medical records) at 68.  As of April 2021, he continued to experience symptoms of shortness of breath.  *Id*. at 2. Notably, Hebron has declined the COVID-19 vaccine.  *Id*. at 299.  The Motion suggests that "[t]here are very legitimate reasons, grounded both in history and in lived experience, why people may have trepidations about these vaccines."  ECF 1762 at 21.

As of April 16, 2021, Hebron weighed ██████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████  While incarcerated, Hebron has completed a number of educational and vocational courses.  *See* ECF 1765-11; ECF 1765-12; ECF 1765-13 at 1; ECF 1765-14 at 1.

The Motion includes a letter to the Court from Hebron.  *See* ECF 1765-18.  In the letter, Hebron apologizes to those whose lives were affected by his actions; describes his difficult

---

[13] This BOP inmate profile has not actually been provided to the Court. The Court is aware of this recidivism rating only in the context of Donson's Affidavit.

childhood and experience while incarcerated; expresses an intent to change; and discusses his plans for the future, such as improving himself educationally and financially. ECF 1765-18. Hebron also states that, if released, he can live with his sister, and he has several job prospects. *Id*. at 3. In addition, the Motion is accompanied by a number of letters submitted on Hebron's behalf by family members and friends. *See* ECF 1765-19. In a letter with the Motion, Hebron's father states that he will "be there to support [Hebron] upon [Hebron's] release." *Id*. at 2.

The Motion asserts that Hebron "has a viable re-entry plan for his release." ECF 1762 at 27. For this claim, it cites to Roberts-Johnson's report, so this is presumably a reference to the reentry recommendations in that report. *See* ECF 1765-8 at 6-8. However, it is not clear that all of these recommendations have actually been arranged, as opposed to simply suggested by Roberts-Johnson. The Roberts-Johnson report also noted that Hebron's father, who is a drug counselor for the Department of Veterans Affairs, indicated his interest in assisting Hebron with defendant's reentry plan. *Id*. at 6.

Hebron submitted an administrative request for compassionate release, which was denied by the Warden of FMC Carswell on June 1, 2021. *See* ECF 1765-7. The government concedes that Hebron has satisfied the administrative exhaustion requirements of the compassionate release statute. ECF 1819 at 5.

## II. Legal Standards

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is

"expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

The Motion invokes both the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A)(i), and § 404 of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194.  I will outline the framework for each.

## A. Compassionate Release

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022).  This provision is an exception to the ordinary rule of finality. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying  compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step

Act"), Pub. L. No. 115-391, 132 Stat. 5194 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020). As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. (Emphasis added). So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, he or she may petition a court directly for compassionate release. *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276. That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021); *see also Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the

defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.  Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.  But, the Fourth Circuit has said that, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release.  *See McCoy,* 981 F.3d at 276-77.[14] In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that

_____

[14] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C). *See McCoy,* 981 F.3d at 276.

compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act. *McCoy*, 981 F.3d at 276. Of significance here, it is only "directed at BOP requests for sentence reductions." *Id.* (citing U.S.S.G. § 1B1.13). "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo*, 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020). In other words, the policy statement does not apply to this Court.

Indeed, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95. Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197.  Notably, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam).  And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).  Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t).

Moreover, the Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169.  However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.  Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).  But, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine

whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *see also United States v. Jones*, No. 22-6071, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, No. 21-6380, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

As mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant. *McCoy*, 981 F.3d at 284 (citation omitted); *see Jenkins*, 22 F.4th at 169. Nevertheless, compassionate release is a "rare" remedy. *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted). And, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).

### B. The Fair Sentencing Act of 2010 and The First Step Act of 2018

Section 3582(c)(1)(B) of 18 U.S.C. provides: "The court may not modify a term of imprisonment once it has been imposed except that – (1) in any case – . . . (B) the court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute...." And, modification is permitted for a defendant who was "sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission. . . ." 18 U.S.C. § 3582(c)(2); *see United States v. Collington*, 995 F.3d 347, 353 (4th Cir. 2021) (noting that " § 3582(c)(2) permits defendants to move for a reduced sentence based on retroactive amendments to the Guidelines"); *United States v. Smalls*, 720 F.3d 193, 195-96 (4th Cir. 2013).[15]

As mentioned, in December 2018 Congress enacted the First Step Act of 2018. *See McCoy*, 981 F.3d at 276. Section 404 of the 2018 FSA, 132 Stat. at 5222, 21 U.S.C. § 841 note, expressly

---

[15] "[A] sentence modification is not a plenary resentencing proceeding." *Martin*, 916 F.3d at 396 (internal quotation marks omitted).

"makes retroactive certain provisions of the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 (2010)." *Jackson*, 952 F.3d at 495; *see Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389, 2397 (2022); *United States v. Lancaster*, 997 F.3d 171, 173 (4th Cir. 2021); *Collington*, 995 F.3d at 352; *Chambers*, 956 F.3d at 669-70; *United States v. Gravatt*, 953 F.3d 258, 260 (4th Cir. 2020); *United States v. Wirsing*, 943 F.3d 175, 177-180 (4th Cir. 2019); *United States v. Venable*, 943 F.3d 187, 188-89 (4th Cir. 2019).   In particular, the 2018 FSA authorizes the modification of a previously imposed sentence for a defendant affected by the statutory changes to the penalty ranges for crack cocaine offenses.  *See, e.g.*, *Jackson*, 952 F.3d at 495; *see United States v. Foster*, ___ Fed. App'x ___, 2022 WL 2826184, at *1 (4th Cir. July 20, 2022) (per curiam); *United States v. McDonald*, 986 F.3d 402, 408-09 (4th Cir. 2021).

The Fair Sentencing Act of 2010 ("2010 FSA"), which took effect on August 3, 2010, "reduced the statutory penalties for cocaine base offenses" in order to "alleviate the severe sentencing disparity between crack and powder cocaine."  *United States v. Peters*, 843 F.3d 572, 575 (4th Cir. 2016); *see Concepcion*, 142 S. Ct. at 2396 (noting that the 2010 FSA was passed "to correct the harsh disparities between crack and powder cocaine sentencing"); *Collington*, 995 F.3d at 351 (noting that "the Fair Sentencing Act reduced sentencing disparities between cocaine and crack cocaine offenses, which were widely criticized for producing racially disproportionate sentencing outcomes"); *see also Wirsing*, 943 F.3d at 177–78.   In particular, the crack-to-powder cocaine disparity was reduced from 100-to-1 to 18-to-1.  *See, e.g.*, *Dorsey v. United States*, 567 U.S. 260, 264 (2012); *Gravatt*, 953 F.3d at 260; *United States v. Black*, 737 F.3d 280, 282 (4th Cir. 2013), *cert. denied*, 572 U.S. 1071 (2014).   And, Congress increased the threshold quantities needed to trigger mandatory sentencing ranges associated with crack cocaine offenses. *See Dorsey*, 567 U.S. at 269; *Gravatt*, 953 F.3d at 260.

Under Section 2 of the 2010 FSA, the sentencing range for possession with intent to distribute less than 28 grams of cocaine base carries a maximum of 20 years of imprisonment; the sentencing range for possession with the intent to distribute more than 28 grams but less than 280 grams of cocaine base is five years to 40 years of imprisonment; and the sentencing range for possession with intent to distribute more than 280 grams of cocaine base is ten years to life imprisonment. Section 3 of the 2010 FSA, which is not at issue here, eliminated the mandatory minimum sentence for simple possession.

Thereafter, the Sentencing Commission amended the Guidelines to conform to the 2010 FSA. *Gravatt*, 953 F.3d at 260. However, the 2010 FSA did "not apply its changes retroactively," so as to "alter statutory minimum terms of imprisonment" that were previously in effect. *Id.* With the enactment in 2018 of the First Step Act, Congress rectified the inequity. *Id.*

Section 404(b) of the 2018 FSA "made the Fair Sentencing Act sentence reductions retroactive . . . by authorizing district courts to impose a reduced sentence on specified 'covered offenses' as if the Fair Sentencing Act were in effect at the time the offenses were committed." *Lancaster*, 997 F.3d at 173; *see also Terry v. United States*, ___ U.S. ___, 141 S. Ct. 1858, 1862 (2021); *United States v. Thomas*, 32 F.4th 420, 423-26 (4th Cir. 2022); *Foster*, 2022 WL 2826184, at *1. In other words, under § 404 of the Act, the provisions of the 2010 FSA apply retroactively to a defendant who was sentenced prior to August 3, 2010, *i.e.*, the effective date of the 2010 FSA. *United States v. Charles*, 932 F.3d 153, 162 (4th Cir. 2019).

Section 404 of the 2018 FSA, 132 Stat. at 5222, 21 U.S.C. § 841 note, provides:

**SEC. 404. Application of Fair Sentencing Act.**

(a) Definition of covered offense.—In this section, the term "covered offense" means a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010 (Public Law 111–220; 124 Stat. 2372), that was committed before August 3, 2010.

32

(b) Defendants previously sentenced.—A court that imposed a sentence for a covered offense may, on motion of the defendant, the Director of the Bureau of Prisons, the attorney for the Government, or the court, impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 (Public Law 111–220; 124 Stat. 2372) were in effect at the time the covered offense was committed.

(c) Limitations.—No court shall entertain a motion made under this section to reduce a sentence if the sentence was previously imposed or previously reduced in accordance with the amendments made by sections 2 and 3 of the Fair Sentencing Act of 2010 (Public Law 111–220; 124 Stat. 2372) or if a previous motion made under this section to reduce the sentence was, after the date of enactment of this Act, denied after a complete review of the motion on the merits. Nothing in this section shall be construed to require a court to reduce any sentence pursuant to this section.

The procedural framework that applies to motions under § 404 is found in 18 U.S.C. § 3582(c)(1)(B).  *See Collington*, 995 F.3d at 353 ("We have held that section 404 motions are brought under § 3582(c)(1)(B)); *Wirsing*, 943 F.3d at 183 (concluding that § 3582(c)(1)(B) is "the appropriate vehicle" for a 2018 FSA motion).  Thus, an eligible defendant may seek to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(B).

Notably, § 404 "permits the district court to *impose* a sentence on defendants under the retroactively applicable Fair Sentencing Act reforms." *Collington*, 995 F.3d at 354 (emphasis in original). The Fourth Circuit has explained that the use of the word "impose," rather than the word "modify" or "reduce," is significant; it grants district courts "greater sentencing authority to determine whether and how to reform individual sentences." *Id.* (comparing the authority given to a district judge under § 404(b) to that given under § 3582(c)).

"Ultimately, the First Step Act contemplates a robust resentencing analysis…." *Id.* at 358. When a new sentence is imposed, "a court does not simply adjust the statutory minimum; it must also recalculate the Guidelines range."  *McDonald*, 986 F.3d at 409 (internal quotation marks omitted).

Of relevance here, "when a court exercises discretion to reduce a sentence, the imposition of the reduced sentence must be procedurally and substantively reasonable." *Collington*, 995 F.3d at 358.   Procedural reasonableness does not "require the district court to hold a resentencing hearing." *Id.* at 360. But, it requires the court "to consider a defendant's arguments, give individual consideration to the defendant's characteristics in light of the § 3553(a) factors, [and] determine—following the Fair Sentencing Act—whether a given sentence remains appropriate in light of those facts, and adequately explain that decision." *Id.*

And, the Fourth Circuit has made clear that, in the context of § 404 of the First Step Act, a district judge must "accurately recalculate the Guidelines sentence range"; "*correct* original Guidelines errors and apply intervening case law made retroactive to the original sentence"; and "consider the § 3553(a) factors to determine what sentence is appropriate." *Id.* at 355 (emphasis in original). Moreover, the sentencing factors in 18 U.S.C. § 3553(a) may be used to "*depart downward* from the new Guidelines range." *Id.* (emphasis in original). But, a district court will abuse its discretion "when it 'impose[s] a reduced sentence' that exceeds the maximum established by the Fair Sentencing Act." *Id.* at 356 (quoting § 404(b)) (alterations in *Collington*).

To recalculate the Guidelines range, the Fourth Circuit has recognized that the district court "may need to make additional findings and identify the attributable drug quantity with more precision than at the original sentencing."  *Foster*, 2022 WL 2826184, at *1; *see Lancaster*, 997 F.3d at 176.  The findings must be supported by the record.  *United States v. Peters*, 843 F.3d 572, 578 (4th Cir. 2016).  Although the court may adopt the findings in the PSR as to the factual basis, it may do so only if "'it clearly resolved any factual disputes.'"  *Foster*, 2022 WL 2826184, at *1 (quoting *United States v. Burnley*, 988 F.3d 184, 190 (4th Cir. 2021) (cleaned up)).

In *Lancaster*, 997 F.3d 171, the Fourth Circuit further clarified how a district court should proceed when presented with a motion to reduce a sentence under § 404 of the First Step Act. First, the court must determine whether the sentence is "'eligible' for consideration 'on the merits.'" *Id.* at 174 (quoting *Gravatt*, 953 F.3d at 262). The sentence will be eligible for consideration if it is for a "covered offense"; the motion is addressed to the court that imposed the subject sentence; and the sentence has not "been 'previously imposed or previously reduced' under the Fair Sentencing Act." *Id.* at 174-75. Upon "determining that a sentence qualifies for review on the merits, the court is then given discretion to impose a reduced sentence as if the Fair Sentencing Act were in effect at the time the covered offense was committed." *Id.* at 175. To make that determination, "the court must engage in a brief analysis that involves the recalculation of the Sentencing Guidelines in light of 'intervening case law' . . . and a brief reconsideration of the factors set forth in 18 U.S.C. § 3553(a)." *Id.* (citing *Collington*, 995 F.3d at 355; *Chambers*, 956 F.3d at 672).

In *Concepcion*, 142 S. Ct. at 2404, the Supreme Court affirmed that "the First Step Act allows district courts to consider intervening changes of law or fact in exercising their discretion to reduce a sentence pursuant to the First Step Act." Examples given in *Concepcion* include "evidence of rehabilitation or other changes in law," "postsentencing evidence of violence or prison infractions," and "nonretroactive Guidelines amendments." *Id*. at 2403-05. District courts are afforded wide deference in performing this analysis; "[a]ll that is required is for a district court to demonstrate that it has considered the arguments before it." *Id*. at 2405. In sum, "the First Step Act tasks district courts with making a holistic resentencing determination as to whether the original sentence remains appropriate in light of the Fair Sentencing Act's reforms." *Collington*, 995 F.3d at 355.

*Concepcion* endorsed an approach already adopted by the Fourth Circuit.  *See, e.g.*, *McDonald*, 986 F.3d at 408-09; *Lancaster*, 997 F.3d at 175-77; *Collington*, 995 F.3d at 354-56; *Chambers*, 956 F.3d at 672; *see also Foster*, 2022 WL 2826184, at *1; *United States v. Thatch*, ___ Fed. App'x ___, 2022 WL 2355490, at *2 (4th Cir. June 20, 2022) (per curiam) (same).[16] District court judges in the Fourth Circuit have done the same.  *See, e.g.*, *United States v. Sappleton*, PJM-01-284-3, 2021 WL 598232 (D. Md. Feb. 16, 2021); *United States v. Day*, 474 F. Supp. 3d 790, 800-01 (E.D. Va. 2020).

*Lancaster*, 997 F.3d 171, is instructive.  There, the defendant was sentenced for conspiracy to traffic in crack cocaine and cocaine powder, in violation of 21 U.S.C. § 846.  *Id.* at 175. The defendant also qualified as a career offender under U.S.S.G. § 4B1.1 and was sentenced on that basis.  The defendant moved for a sentence reduction under § 404.  The district court found that the defendant was eligible for discretionary relief under § 404, because his sentence was subject to modification under the 2010 FSA.  But, the district court "did not recalculate the defendant's Guidelines sentencing range in light of 'intervening case law.'" *Id.* at 176 (quoting *Chambers*, 956 F.3d at 672).  Instead, it found that it would have imposed the same sentence, even if the 2010 FSA had been in effect at the time of the original sentencing.

On appeal, the Fourth Circuit considered what a district court is required to analyze "on the merits" of a motion for a sentence reduction when a defendant is eligible for discretionary relief

---

[16] To the extent there is any possible daylight between *Concepcion* and the Fourth Circuit's precedent predating *Concepcion*, *Concepcion* held that the 2018 FSA "*allows* district courts to consider intervening changes of law or fact," 142 S. Ct. at 2404 (emphasis added), but it described *Collington*, 995 F.3d at 355, as holding that a district court "*must* consider changed law and facts." 142 S. Ct. at 2398 n.2 (emphasis added).  It is not clear that there is much practical difference between these two positions, at least in this case, because *Concepcion* also affirmed that "a district court must generally consider the parties' nonfrivolous arguments before it."  *Id.* at 2404.  Here, the parties have made extensive arguments relating to intervening changes.

under the First Step Act.   The defendant argued that if the district court had recalculated his Guidelines range in light of intervening case law he would have received a reduced sentence because he no longer qualified as a career offender, in light of the Fourth Circuit's decision in *United States v. Norman*, 935 F.3d 232 (4th Cir. 2019).   The Fourth Circuit agreed, finding "that additional analysis was required" before the district court could decline to reduce defendant's sentence.  *Lancaster*, 997 F.3d at 172. The *Lancaster* Court explained that "to determine whether a sentence under the Fair Sentencing Act would be the same as the sentence previously imposed . . . the court would at least have to" recalculate the defendant's Guidelines range on the basis of the changes to the career offender enhancement and consider the § 3553(a) factors to "determine whether its balancing of the factors was still appropriate in light of intervening circumstances." *Id*. at 175.

### III. COVID-19

#### A.

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[17]   COVID-19 spawned "a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first

---

[17] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, REUTERS (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of August 8, 2022, COVID-19 has infected approximately 92 million Americans.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed August 8, 2022).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.* That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").  Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.  The judiciary, too, faced many operational challenges.

People who are stricken with the virus sometimes experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus.  The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.  But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  In May 2022, it updated its guidance to reflect the most available data.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 2, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the BMI is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196.

Although there is currently no cure for the virus, medical treatments have continued to improve. And, significantly, we have seen the rollout of four vaccines for COVID-19 (Pfizer, Moderna, Johnson & Johnson, and Novavax). *See* Rebecca Robbins and Carl Zimmer, *A fourth COVID vaccine is cleared for use in the United States.*, N.Y. TIMES (July 20, 2022), https://www.nytimes.com/2022/07/19/health/cdc-novavax-covid-vaccine.html. Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders. But, the criteria for eligibility has since been approved for all persons six months of age and older. *See* Rhitu Chatterjee, *CDC clears the way for vaccinations for children 6 months to 5 years old*, NPR (June 18, 2022), https://www.npr.org/sections/health-shots/2022/06/18/1105929247/vaccinations-for-children-6-months-to-5-years-old-can-begin-after-cdc-clears-the. Approximately 67% of the total U.S. population is fully vaccinated, including 30% of people from ages 5 to 11, 60% of people from ages 12 to 17, 74% of people from

ages 18 to 64, and 92% of people age 65 and up.  *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited August 8, 2022).

Moreover, approximately 107.5 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older.  *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated June 13, 2022).  And, federal regulators approved a second booster dose for individuals age 50 and older.  *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases.  *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region.").  But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants");  *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-

challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, both around the world and in the United States. It sparked further cause for concern, because it was highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Then, the number of COVID-19 cases again declined. *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y. Again, the country began to return to normalcy.

Unfortunately, that respite did not last long. We soon experienced another surge in COVID-19 cases. *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html. In particular, a new subvariant of the virus began "spreading rapidly" and soon became "the dominant form of the virus . . . ." *See* Isabella

Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9,

2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases.    As

of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," is "spreading

quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired

by vaccinated people, or those infected by earlier variants."  Ed Yong, *Is BA.5 the 'Reinfection*

*Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-

omicron-variant-covid-surge-immunity-reinfection/670485/.  And, the "Biden administration is

preparing for the possibility that 100 million Americans will be infected with the coronavirus this

fall and winter . . . ."  Amelia Nirenberg, *A Coming Fall Surge?*,  N.Y. TIMES (May 9, 2022),

https://www.nytimes.com/2022/05/09/briefing/100-million-coronavirus-covid-us.html.

## B.

At the outset of the pandemic, in an effort to stem the spread of the virus, people were

urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-*

*19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION,

https://bit.ly/3dPA8Ba (last accessed December 9, 2020).  However, social distancing is

particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg.*

*Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir.

Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on

[sic] the opposite made to contain people in one area.").  Indeed, prisoners have little ability to

isolate themselves from the threat posed by the coronavirus.  *Id*.; *see Cameron*, 2020 WL 2569868,

at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28,

2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating

to maintaining sanitation, the risk of infection and the spread of infection within prisons and

43

detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020). And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe,'* WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help

prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at *2.  Notably, the BOP implemented

substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to

treat those who are infected.  As the Third Circuit recognized in *United States v. Raia*, 954 F.3d

594, 597 (3rd Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's

spread."[18]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19

experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate

who presents with one of the risk factors identified by the CDC should be considered as having an

"extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13

cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael

Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for

inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL,

---

[18] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

On January 4, 2021, at about the time of the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance  (Jan.  4,  2021),  https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf.  It provides that administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec.  21,  2020),  https://www.forbes.com/sites/walterpavlo/2020/12/21/  federal-bureau-of-

prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.  As of August 8, 2022, the BOP had 141,009 federal inmates and approximately 36,000 staff.  And, by that date, the BOP had administered 326,498 vaccine doses to staff and inmates.  *See* BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last accessed August 8, 2022).

As of August 8, 2022, the BOP reported that 450 federal inmates, out of a total population of 141,009, and 560 BOP staff, out of some 36,000 staff members, currently tested positive for COVID-19.  Moreover, 49,593 inmates and 13,408 staff have recovered from the COVID-19 virus. In addition, 302 inmates and seven staff members have died from the virus.  The BOP has completed 128,723 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FMC Carswell, where the defendant is imprisoned, the BOP reported that as of August 8, 2022, out of a total of 1,118 inmates, zero inmates and 23 staff members have tested positive, eight inmates and zero staff members have died of COVID-19, and 745 inmates and 64 staff have recovered at the facility. In addition, 335 staff members and 1,608 inmates have been inoculated with the vaccine at FMC Carswell.  *See* https://www.bop.gov/coronavirus/; BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/crw/ (last visited August 8, 2022).

## IV. Discussion

Hebron argues that extraordinary and compelling circumstances are present under the compassionate release statute given his need for "specialized mental health and rehabilitative services," combined with his transgender status and his particular vulnerabilities to COVID-19. ECF 1762 at 1, 20.  In the alternative, he contends that he is eligible for resentencing under § 404 of the First Step Act, because the underlying acts of the racketeering conspiracy in question involved trafficking in cocaine base.  ECF 1616; ECF 1762 at 22-25; ECF 1869.  Whether reached

through compassionate release or § 404, Hebron maintains that the § 3553(a) sentencing factors warrant reduction of his sentence either to time served, or a reduction from 360 months of imprisonment to 300 months, *i.e.*, a reduction of 60 months.  ECF 1762 at 25-28.  The government opposes Hebron's argument at each step.  ECF 1819; ECF 1866.

### A. Compassionate Release:  Extraordinary and Compelling Circumstances

Hebron clearly faces serious mental health challenges.  And, as a general matter, prison is rarely an ideal environment to provide mental health treatment.  Nevertheless, I am not persuaded that Hebron's particular mental health needs, on their own, constitute extraordinary and compelling circumstances.

The Motion essentially critiques certain aspects of BOP's approach to Hebron's mental health care.  For example, the Motion takes issue with the fact that, at the time of filing, Hebron was on care level one and was not receiving psychotropic medications.  *See* ECF 1762 at 5-6, 8-16.  Conversely, the government vigorously asserts that BOP's effort in this regard has been more than adequate.  *See* ECF 1819 at 7-15; ECF 1819-3, ¶¶ 5-14.  In my view, Hebron's medical records reflect that the BOP has devoted meaningful resources towards Hebron's mental health care.

To be sure, it is difficult for the Court to evaluate the efficacy of the BOP's medical determinations as to Hebron's mental health treatment.  However, what seems particularly significant is that, as all parties appear to agree, Hebron has shown significant improvement since approximately 2020.  *See* ECF 1819 at 15; ECF 1826 at 5.  The updated summary of Tonyah Roberts-Johnson, dated February 8, 2022, is particularly helpful.  *See* ECF 1828.  She notes that Hebron "has been alert, oriented, open and forthcoming with information;" that there were "no expressed thoughts of self-harm or suicidality, homicidal ideation, intent, or plan;" that Hebron

48

reported "being clinically stable" most of the time; that he continued to use clinical tools and self-regulation to address his symptoms and avoid conflict; and that "Hebron has been ecstatic about his overall progress inclusive of his ability to walk away from potential conflict." ECF 1828 at 1-2.

Moreover, Roberts-Johnson described certain changes in Hebron's mental health treatment that appear to address many of the deficiencies identified in the Motion. For example, in recognition of Hebron's efforts, in December 2021 BOP moved him to care level two, allowing him to reintegrate into the general population and participate in mental health groups. *Id*. at 1. Furthermore, Hebron has resumed taking psychotropic medication and receives more routine clinical care, "which have all aided Hebron with his goals of remaining mentally and emotionally stable, and without any behavioral issues." *Id*. at 1-2.

Nonetheless, defendant still asserts that he is not receiving the most effective care, and would benefit from community-based treatment. ECF 1869 at 4-5. But, in light of these marked improvements in Hebron's situation in the course of BOP treatment, and the particular changes to the care he has been receiving, it is difficult to see how Hebron's current mental health treatment situation genuinely constitutes an "extraordinary and compelling" circumstance.

Defendant has provided little authority to the Court as to finding extraordinary and compelling circumstances premised solely on inadequate mental health care. To be sure, the Court is "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (internal citation omitted). And, situations involving a defendant's mental health condition could warrant a finding of extraordinary and compelling circumstances. However, the only two cases cited in the Motion as to mental health conditions as a basis for extraordinary and compelling circumstances miss the mark. *See United*

*States v. Hatcher*, No. 18 Cr. 454-10, 2021 WL 1535310 (S.D.N.Y. Apr. 19, 2021); *United States v. Gonzalez*, No. 3:19-cr-00090, 2020 WL 7024905 (D. Conn. Nov. 30, 2020). Both of these decisions found extraordinary and compelling circumstances specifically in the context of the COVID-19 pandemic, and in both cases the defendants had a number of other health conditions. *See Hatcher*, 2021 WL 1535310, at *1, 3-4; *Gonzalez*, 2020 WL 7024905, at *3-5.

I am mindful that the CDC's criteria are not binding in the analysis of whether a health condition qualifies as an extraordinary or compelling basis for compassionate release. *See Hargrove*, 30 F.4th at 194. Nevertheless, the CDC criteria provide useful information. And, the CDC has stated: "Having ███████████████████████████ ███████ can make you more likely to get very sick from COVID-19." *People with Certain Medical Conditions*, *supra*.

Indeed, it is apparent that the effects of COVID-19 in the prison context have the potential to exacerbate mental health challenges. District court judges have recognized that, in light of the pandemic, mental health conditions may be a basis for compassionate release. *See, e.g.*, *United States v. Martinez*, 15-CR-1299, 2022 WL 126306, at *5 (S.D. Cal. Jan. 13, 2022); *United States v. Newell*, 1:13-CR-165, 2021 WL 3269650, at *6-7 (E.D.N.C. July 30, 2021); *United States v. Qadar*, 00-CR-603, 2021 WL 3087956, at *9 (E.D.N.Y. July 22, 2021); *Hatcher*, 2021 WL 1535310, at *1, 3-4; *United States v. Mowry*, No. 1:18-cr-00015-NT, 2021 WL 265245, at *4-7 (D. Me. Jan. 26, 2021); *Gonzalez*, 2020 WL 7024905, at *3-5; *United States v. Rodriguez*, 476 F. Supp. 3d 1071, 1075 (S.D. Cal. 2020). I note, however, that they have not always reached that conclusion. *See, e.g.*, *United States v. Thorne*, No. 5:15-CR-114, 2021 WL 2056997, at *3-4 (E.D.N.C. May 21, 2021); *United States v. Monserrate-Garcia*, No. 7:18-CR-20, 2021 WL

262076, at *2 (E.D.N.C. Jan. 26, 2021); *United States v. Wragg*, Crim. No. 15-398, 2020 WL 4015204, at *8 (E.D. Pa. July 16, 2020).

As noted, the Motion also references Hebron's transgender status to support a finding of extraordinary and compelling circumstances.  ECF 1762 at 1, 20.  The Motion points out that Hebron is housed in a female prison.  *Id*. at 9, 17, 26.  But, for the most part, the Motion does not mount a sustained argument that Hebron's transgender status constitutes an extraordinary and compelling circumstance.

The Court does not doubt that transgender individuals face particular challenges in prison, as they do in our society generally.  However, in many respects, it appears that BOP recognizes Hebron's gender identity in an appropriate way.  For example, BOP uses male pronouns for Hebron.  He has been receiving ███████████████████████████████████████.  *See* ECF 1765-17 at 7, 19, 161-81, 400-19, 501-04.  And, the updated summary provided by Roberts-Johnson mentions that, according to Hebron, he is "████████████████████████████ ████████████████████████████████████████████████████████████████  ECF 1828 at 2.

As discussed, Hebron is also █████████████████ in the most recent measurement reflected in the BOP medical records.  ECF 1765-17 at 3.  The CDC has identified █████ as an underlying health condition that "can make you more likely to get very sick from COVID-19."  *People with Certain Medical Conditions*, *supra*.  And, numerous courts have found that, in light of the COVID-19 pandemic, ██████ particularly when combined with other chronic medical conditions, can qualify as a compelling reason for compassionate release.  *See, e.g.*, *United States v. Smith*, 538 F. Supp. 3d 990, 995 (E.D. Cal. 2021) ("Many courts have also found that people who have a ████████████████████████████████████████████" are at greater

risk of severe COVID-19."); *United States v. Staten*, PJM-01-284-4, 2020 WL 4904270, at *2 (D. Md. Aug. 18, 2020) (finding an "extraordinary and compelling reason" for compassionate release based on a BMI of 38); *United States v. Williams*, PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020) (finding obese defendant with a BMI of 32.5 qualified for compassionate release in light of COVID-19); *United States v. Quintero*, 08-CR-6007L, 458 F.Supp.3d 130, 132 (W.D.N.Y. 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension satisfied an extraordinary and compelling reason); *United States v. Dawson*, No. 18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on a defendant's obesity).

On the other hand, Hebron has declined the COVID-19 vaccine.  ECF 1765-17 at 299. Judge Stephanie Gallagher of this Court has previously observed: "Courts now widely recognize that a refusal to take preventative measures to protect oneself from COVID-19 undermines any assertion that the risk of viral infection constitutes an extraordinary and compelling reason justifying release . . . . Any decision to the contrary would create a perverse incentive in favor of declining the vaccine, undermining the BOP's efforts to protect its incarcerated population and to allow prison operations to return to some degree of normalcy in the coming months."  *United States v. Ayres*, SAG-04-004, 2021 WL 2352322, at *2 (D. Md. June 9, 2021) (collecting cases); accord *United States v. Manon*, Crim. No. 16-00460 (SDW), 2022 WL 408958, at *3 (D.N.J. Feb. 10, 2022); *United States v. Carter*, 3:19-cr-356, 2022 WL 272196, at *2-3 (N.D. Ohio Jan. 28, 2022); *United States v. Culp*, 92-cr-81058, 2021 WL 5834312, at *2 (E.D. Mich. Dec. 9, 2021); *United States v. Highight*, 4:14-CR-129(4), 2021 WL 5299249, at *6 (E.D. Tex. Nov. 12, 2021); *United States v. Brice*, SAG-07-0261, 2021 WL 1926713, at *3 (D. Md. May 13, 2021); *United States v. Siegel*, TDC-03-0393, 2021 WL 962491, at *2 (D. Md. Mar. 15, 2021).  Nor am I

persuaded by the arguments offered in the Motion as to why the Court should overlook defendant's vaccine refusal.

Nevertheless, in light of the interaction between Hebron's mental health conditions and COVID-19, I will assume, for purposes of resolving the Motion, that Hebron has demonstrated extraordinary and compelling circumstances under the compassionate release statute. The next step is whether relief is warranted under the § 3553(a) sentencing factors. In my judgment, the Motion falters at these factors, which I discuss, *infra*.

### B. Section 404 of the 2018 FSA

Alternatively, Hebron argues that he is eligible for resentencing under § 404 of the First Step Act "because one of the underlying acts in the [racketeering] conspiracy involved trafficking in cocaine base, a statutory section the penalties for which were modified by the First Step Act." ECF 1762 at 23; *see id*. at 23-25; ECF 1869. The government vigorously disputes that Hebron is eligible for resentencing under § 404. ECF 1866.

As discussed, § 404 of the 2018 FSA makes the provisions of the 2010 FSA available to a defendant who was sentenced before August 3, 2010, for a "covered offense." Section 404(a) defines a "covered offense" as "a violation of a Federal criminal statute, the statutory penalties for which were modified by Section 2 or 3" of the 2010 FSA, which reduced the statutory penalties for cocaine base offenses. "[T]here is no indication that Congress intended a 'complicated and eligibility-limiting determination' at the 'covered offense' stage of the analysis." *Gravatt*, 953 F.3d at 262 (quoting *Wirsing*, 943 F.3d at 186). "[T]he central question district courts must ask is 'whether the Fair Sentencing Act modified the statutory penalties for petitioner's offense.'" *Thomas*, 32 F.4th at 425 (quoting *Terry*, 141 S. Ct. at 1862). "In making this determination, the

focus of [the] inquiry is 'on the statutory penalties for petitioner's offense, not the statute or statutory scheme.'"  *Id.* at 425-26 (quoting *Terry*, 141 S. Ct. at 1863).

In *Wirsing*, 943 F.3d at 186, the Fourth Circuit clarified: "All defendants who are serving sentences for violations of 21 U.S.C. § 841(b)(1)(A)(iii) and (B)(iii), and who are not excluded pursuant to the expressed limitations in Section 404(c) of the First Step Act, are eligible to move for relief under that Act."  Subsequently, in *Gravatt*, 953 F.3d at 264, the Fourth Circuit affirmed the § 404 eligibility of defendants convicted of a drug conspiracy under 21 U.S.C. § 846 involving both cocaine base and another drug, noting that there was "nothing in the text of the Act requiring that a defendant be convicted of a single violation of a federal criminal statute whose penalties were modified by section 2 or section 3 of the Fair Sentencing Act."

More recently, in *Thomas*, 32 F.4th at 423-30, the Fourth Circuit considered whether a defendant was eligible for resentencing under § 404 when he was convicted of engaging in a continuing criminal enterprise ("CCE") in violation of 18 U.S.C. § 848(a) and (c), and his CCE conviction was predicated on cocaine base offenses.  Citing *Terry*, the Fourth Circuit said no, remarking, *id.* at 427: "Though the [2010 FSA] did modify the penalties for [the defendant's] predicate violations under §§ 841(a)(1) and 846, [the defendant's] statutory penalty range for violating §§ 848(a) and (c) remained the same before and after the FSA—20 years to life imprisonment, a fine, and a term of supervised release."[19]

Hebron was not convicted of an offense under §§ 841 or 846.  Rather, he was convicted of conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d).  The penalties for this offense are specified in 18 U.S.C. § 1963(a), which provides: "Whoever violates

---

[19] *Thomas* recognized that *Terry* had rejected the broader approach taken by the Fourth Circuit in *United States v. Woodson*, 962 F.3d 812 (4th Cir. 2020). *Thomas*, 32 F.4th at 425-26.

any provision of section 1962 of this chapter shall be fined under this title or imprisoned not more than 20 years (or for life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment), or both . . . ."  In other words, if the underlying racketeering activity has a maximum penalty of life imprisonment, the same maximum penalty applies to the § 1962(d) offense.  And, a violation of 21 U.S.C. § 841(b)(1)(A)(iii) carries a maximum penalty of life imprisonment. *See United States v. Simmons*, 11 F.4th 239, 255 (4th Cir. 2021) ("For example, a violation of 21 U.S.C. § 841 for manufacturing, distributing, or dispensing controlled substances, if certain drug quantity thresholds are met, is a racketeering act that carries a penalty of up to life imprisonment."); *see also Terry*, 141 S. Ct. at 1863 ("Before 2010, a person charged with the original elements of subparagraph (A)—knowing or intentional possession with intent to distribute at least 50 grams of crack—faced a prison range of between 10 years and life. But because the [2010 FSA] increased the trigger quantity under subparagraph (A) to 280 grams, a person charged with those original elements after 2010 is now subject to the more lenient prison range for subparagraph (B): 5-to-40 years.").

In light of this penalty scheme, district courts have wrestled with the question of whether, and under what circumstances, a § 1962(d) conviction premised on underlying racketeering activity involving cocaine base can render a defendant eligible for resentencing under § 404.  *See, e.g.*, *United States v. Allen*, No. 3:03cr394, 2022 WL 2124495, at *8 (E.D. Va. June 13, 2022) (analyzing both *Terry* and *Thomas* and concluding that the defendant was not eligible under § 404 even if "the Fair Sentencing Act modified the statutory penalties for the specific racketeering activities that form a predicate for Defendant's RICO conspiracy conviction"); *United States v. Sumler*, Crim. No. 95-154-2, 2021 WL 6134594, at *12 (D.D.C. Dec. 28, 2021) (finding, conversely, that a § 1962(d) conviction premised on cocaine base offenses was a covered offense,

55

and remarking that "even though the penalty provision in § 1963(a) was not directly amended by the Fair Sentencing Act, examination of the predicate offense convictions is necessary to determine whether the 'statutory penalties' were 'modified'"); *United States v. Portee*, No. 01 Cr. 450, 2021 WL 5281769, at *3 (S.D.N.Y. Nov. 12, 2021) (defendant convicted of § 1962 offense was eligible under § 404 because the "only racketeering predicate that carried a maximum term of life imprisonment" was a 21 U.S.C. § 841 offense modified by the 2010 FSA); *United States v. Linton*, No. 4:95-CR-41-3H, 2021 WL 2482683, at *1 (E.D.N.C. June 17, 2021) (concluding, with little analysis, that defendant's § 1962(c) offense "is a covered offense because one of the underlying acts involved trafficking in cocaine base, a statutory section the penalties for which were modified by the First Step Act," when defendant acknowledged participating in at least two underlying acts in his plea agreement, but did not specify which ones).

In this case, the Indictment alleged that the racketeering conspiracy involved racketeering activity including "narcotics trafficking offenses indictable under 21 U.S.C. §§ 841 and 846" (ECF 1765-1 at 10, ¶ 19), and several of the overt acts in furtherance of the conspiracy involved cocaine base. *Id*. at 15-17. *See, e.g.*, *id*. at 15-17, ¶ 25(24), (32), (34). Other counts of the Indictment charged Hebron's codefendants with §§ 841 and 846 cocaine base offenses. *See id*. at 30-33, 35-36, 39, 41, 44-45, 47-48. But, Hebron was not charged with any offense under 21 U.S.C. §§ 841 or 846, and none of the cocaine base overt acts in Count One involved him.

The Plea Agreement specified that the maximum statutory penalty was life imprisonment (ECF 920, ¶ 3), and that the base offense level was 43 because the "underlying racketeering activity in this case involved first degree murder." *Id*. ¶ 6(a). The Plea Agreement, including the factual stipulation, does not mention any conduct of Hebron or the codefendants involving cocaine base. Rather, it states only that one of the purposes of the racketeering enterprise was "narcotics

trafficking." ECF 920 at 12. And, the stipulation stated that Hebron knowingly conspired to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity, and that a conspirator in this enterprise would commit at least two acts of racketeering conspiracy, which were not specified. *Id*. at 12. The PSR noted that the statutory maximum for Hebron's offense was life imprisonment. ECF 1765-5, ¶ 81. And, first degree murder was the "underlying racketeering activity" to calculate the offense level. *Id*. ¶ 40.

In any event, in the context of this case, it is unnecessary to resolve whether Hebron's conviction is a "covered offense," rendering him eligible for resentencing under § 404. Even assuming that Hebron is eligible for resentencing under § 404, the Court ultimately winds up in the same place as under the compassionate release analysis—namely, a consideration of the § 3553(a) sentencing factors. Indeed, defendant states in the Reply, ECF 1826 at 1 n.2: "Alternatively, Mr. Hebron seeks a sentence reduction under § 404 of the First Step Act; however, the Court need not decide that grounds for relief if it finds Hebron eligible for compassionate relief under 18 U.S.C. § 3582(c)(1)(A)." And, as discussed above, I shall assume, for purposes of this Memorandum Opinion, that extraordinary and compelling circumstances are present in Hebron's case under the compassionate release statute.

## C. Analysis

As indicated, even when a court finds extraordinary and compelling reasons for compassionate release, relief is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of the factors set forth in 18 U.S.C. § 3553(a). *See High*, 997 F.3d at 186. Similarly, assuming Hebron is eligible for resentencing under § 404, the district court exercises its discretion, and may impose a reduced sentence, by engaging in an "analysis that involves the recalculation of the Sentencing Guidelines in light of 'intervening case law' . . . and a brief reconsideration of the

factors set forth in 18 U.S.C. § 3553(a)."  *Lancaster*, 997 F.3d at 175 (citing *Collington*, 995 F.3d at 355; *Chambers*, 956 F.3d at 672).  As with compassionate release motions, a district court may "consider intervening changes of law or fact in exercising [its] discretion to reduce a sentence pursuant to the First Step Act."  *Concepcion*, 142 S. Ct. at 2404.

The Motion concedes, in the context of § 404, that "Mr. Hebron's guidelines would not change because of the murder cross-reference."  ECF 1762 at 24.  In other words, there is no dispute that Hebron's Guidelines range today would be precisely what it was in 2010: a total offense level of 39 and a criminal history category of VI, yielding Guidelines ranging from 360 months of imprisonment to life.  *See* ECF 1025 at 1.  There is no suggestion in the briefing of any intervening case law, or other change in sentencing law, that would affect Hebron's sentence. Indeed, there is fundamentally no dispute that, even if Hebron is technically eligible for resentencing under § 404, there was no real connection between any cocaine base offense and Hebron's sentence.

The sentencing factors under 18 U.S.C. § 3553(a) include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

The Motion argues that the § 3553(a) factors warrant a reduction of Hebron's sentence to time served or, in the alternative, a reduction from 360 months to 300 months of imprisonment. ECF 1762 at 25-28.  In particular, the Motion emphasizes Hebron's mental and physical health and need for treatment; his transgender status; asserts that Hebron is not a danger to the

community; points to Hebron's rehabilitative efforts and maturation process; his reentry plan; and the effects of COVID-19.  ECF 1762 at 25-28.

In my judgment, the § 3553(a) factors counsel against a reduction of Hebron's sentence. In the first place, Hebron's offense was extraordinarily grave.  As a member of TTP, he participated in an extensive if not ruthless criminal enterprise, with activities that included murder and other violence, drug trafficking, and robbery.  ECF 920 at 12.  The harmful effect of such an enterprise on the community in which the gang was active cannot be overstated.  As Judge Quarles found, Hebron's "admitted conduct establishe[d]" that he "murdered David Leonard Moore" in a brutal fashion.  ECF 1765-4 at 27; *see* ECF 920 at 15-16.  After murdering Moore, Hebron apparently wrote a poem, ECF 920 at 16: "'Red robins flyin round my head nig** goin brazy [sic] I guess just shot a nig** in the head cause he wear blue but claim red/plus I just wanted the satisfaction of seein a nig** dead.'"

In addition, Hebron also had a meaningful criminal history, with six prior adult criminal convictions.  ECF 1765-5, ¶¶ 60-69.  Some of these offenses were less serious than others.  But some offenses were significant.  For example, Hebron's 2005 conviction for wearing, carrying, and transporting a handgun upon his person, as well as resisting arrest, involved Hebron fleeing from a police officer; kicking the officer and yelling obscenities; and reaching for his left rear pocket, which contained a loaded .22 caliber revolver.  *Id*. ¶ 65.  Furthermore, Hebron accumulated a record of violating probation, and was on probation at the time of the instant offense.  *Id*. ¶¶ 61, 63, 71.  All of this yielded a criminal history category of VI, even without a career offender designation.  *Id*. ¶ 73.

To be sure, both the instant racketeering offense and these past offenses were "contextualized," as Judge Quarles put it when he considered many of these same issues, by

relative youth, mental health challenges, and a difficult childhood.  ECF 1765-4 at 27.  But, as Judge Quarles found at the time, Hebron's conduct was still extremely serious.

In light of these circumstances, a significant sentence was amply warranted.  And, in my view, the 30-year sentence imposed by Judge Quarles was not unreasonable.  It was at the low end of the Guidelines range of 360 months to life imprisonment—a range which, as defendant concedes (*see* ECF 1762 at 24), would be the same today.  ECF 1765-5, ¶ 82.  And, it was a sentence within the C plea range to which Hebron himself had agreed.  *See* ECF 920, ¶ 9.

After carefully considering the mental health arguments raised in the Motion, I conclude that they do not warrant disrupting the finality of Hebron's original sentence.  There is no dispute that Hebron requires mental health treatment.  *See* ECF 1819 at 35.  But, it seems clear that the BOP is making a substantial effort to treat Hebron.  The Motion essentially asserts that the BOP's determinations regarding Hebron's mental health treatment are not the correct ones.  However, in this regard, it is significant that, as discussed, Hebron's situation appears to have improved since 2020.  Indeed, the most recent relevant information available to the Court—the updated summary of Tonyah Roberts-Johnson, dated February 8, 2022—indicates that not only has Hebron made considerable progress, but that a number of the specific deficiencies with the BOP's care of Hebron, as asserted in the Motion, have been addressed.  *See* ECF 1828.  Defendant still argues that his treatment is inadequate.  But, Hebron's improvement tends to support the government's argument that the BOP's treatment approach has been reasonable.  In addition, to the extent that the Motion develops an argument based on Hebron's transgender status, it appears that the BOP has taken a number of steps to accommodate this status, as discussed above.

In considering a motion under the First Step Act, courts often look to a defendant's post-sentencing conduct, because it "provides the most up-to-date picture of [his] 'history and

characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)). Rehabilitation efforts can be considered, although rehabilitation alone cannot serve as a basis for compassionate release. *Davis*, 2022 WL 127900, at *1; *see Cohen*, 2022 WL 2314300, at *1 (indicating that district judge erred by failing to consider "positive postsentencing conduct"); *Lancaster*, 997 F.3d at 175 ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *United States v. McDonald*, 986 F.3d 402, 410-12 (4th Cir. 2021) (noting that on a motion to reduce sentence under the First Step Act, district court must consider defendant's post-sentencing conduct); *United States v. Randall*, 837 Fed. App'x 1008, 1009 (4th Cir. 2021) ("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation."); *United States v. Rudisill*, 834 Fed. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct).

On the issue of post-sentencing conduct, Hebron's disciplinary history is troubling, as he has more than 70 disciplinary infractions. *See* ECF 1765-9. The Motion argues that, when put in context, Hebron's disciplinary history "shows that [he] is not a danger to the public's safety or another person and is independently learning to redirect himself." ECF 1762 at 16. Donson further develops this argument. *See* ECF 1765-20. I am not persuaded.

The infractions include assault without serious injury (the most recent infraction), disruptive conduct, threatening bodily harm, possessing a dangerous weapon, and fighting with another person, in addition to numerous other violations, reflect an inability to conform to societal expectations. *See* ECF 1765-9. By the Court's count, between 2012 and 2020, there appear to be 20 infractions for assault without serious injury, albeit with most happening in the first several

years of this period.  ECF 1765-9 at 1, 4-5, 10-15.  Indeed, even Donson classifies 36 of Hebron's infractions as "for high severity conduct," with only three for low security conduct.  ECF 1765-20, ¶ 11.  Certainly, defendant's mental health circumstances may have contributed to this disciplinary history, as the Motion asserts.  *See* ECF 1762 at 16.  But, fundamentally, the Court cannot overlook this lengthy accumulation of infractions, as it signals the inability or unwillingness of Hebron to conform his conduct to societal expectations.

It is also noteworthy that Donson, who was retained by defendant, concurs with the BOP's assessment that Hebron has a "high risk for general recidivism."  ECF 1765-20, ¶ 19.  Donson also concludes that the risk for "violent recidivism" is medium, to be near the threshold of low by November 2021.  *Id*.  Although this is better than a high risk for violent recidivism, it is hardly reassuring.

Hebron cites his educational coursework, as well as his letter to the Court, in which he apologizes for his actions.  *See* ECF 1762 at 26-27; ECF 1765-11; ECF 1765-12; ECF 1765-13 at 1; ECF 1765-14 at 1; ECF 1765-18.  His coursework, as well as this letter, are certainly laudable, as are the improvements made by Hebron since 2020 that have been discussed above.  On the whole, however, I find that they do not tip the scales in favor of release or sentence reduction, when considered alongside the other factors and circumstances analyzed here.

The Motion also invokes Hebron's "viable re-entry plan for his release."  ECF 1762 at 27.  Although the report by Roberts-Johnson contained several recommendations as to what Hebron "would benefit most from . . . upon release" (ECF 1765-8 at 7), it is not clear that all of these steps have actually been arranged, as opposed to simply suggested by Roberts-Johnson.  Furthermore, the government raises reasonable concerns as to the Court's ability to ensure effective compliance with any conditions that the Court might impose regarding Hebron's mental health treatment,

should he be placed on supervised release.  *See* ECF 1819 at 22.

Finally, as part of the § 3553(a) analysis, many judges in this District have considered a change in the sentencing law landscape that a defendant would face if prosecuted today for the same offense.  As Judge Bennett has explained: "[C]hanges in the sentencing law landscape are relevant to the Court's analysis of whether the Court's sentence appropriately addresses 'the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter crime, and protect the public."  *United States v. Johnson*, RDB-07-0153, ECF No. 183 at 10-11 (D. Md. Oct. 14, 2020).  *See also, e.g., Jones*, 2022 WL 2303960, at *1 (recognizing that courts have discretion "to *consider* leniency" in light of charges in current law) (emphasis in *Jones*); *McCoy*, 981 F.3d at 285-86; *United States v. Stockton*, ELH-99-352, 2021 WL 1060347, at *14 (D. Md. Mar. 17, 2021); *United States v. Chandler*, GLR-05-0181, ECF 119 at 1-2 (D. Md. May 14, 2020); *United States v. Laurey*, JKB-06-0586, ECF 81 at 1, 3 (D. Md. Feb. 19, 2020); *United States v. Wesley*, JKB-10-0118, ECF 73 at 1 (D. Md. Feb. 18, 2020); *United States v. Smith*, DKC-98-0252, ECF 92 at 4 (D. Md. Feb. 14, 2020); *United States v. Watts*, PJM-06-036, ECF 114 at 7 (D. Md. Feb. 6, 2020); *United States v. Thompson*, CCB-09-0128, ECF 123 at 2 (D. Md. Jan. 16, 2020).  Furthermore, intervening legal changes may be considered under the § 404 analysis.  *See Concepcion*, 142 S. Ct. at 2404.

Here, however, there is no suggestion as to any intervening change in sentencing law that might affect Hebron.  Indeed, the Motion contains no argument that Hebron would receive a different sentence were he to be sentenced today.  As discussed, his Guidelines range, which was driven by the murder of David Moore, would not change.  And, even if defendant were considered eligible for resentencing under § 404, cocaine base conduct played no role in defendant's sentence.

### V. Conclusion

For the reasons stated above, even if extraordinary and compelling circumstances exist for Hebron under the compassionate release statute, or even if Hebron is eligible for resentencing under § 404 of the First Step Act, the Court concludes that his existing sentence is appropriate. Accordingly, I shall deny the Motion.

Because this Memorandum Opinion contains considerable discussion of potentially sensitive medical information, including as to Hebron's mental health, I will place it temporarily under seal.  Within 21 days of the docketing of this Memorandum Opinion and accompanying Order, counsel shall inform the Court if they believe any portion of this Memorandum Opinion should remain under seal.  If so, counsel should submit a proposed redacted version of the Memorandum Opinion.

Any sealing recommendation should be joint, if possible.  If counsel have not communicated to the Court regarding sealing within 21 days of the date of docketing, I will assume that there is no need to seal the Memorandum Opinion, and I will direct the Clerk to unseal it.

An Order follows, consistent with this Memorandum Opinion.

Date: August 10, 2022                                        _____/s/_____
                                                            Ellen L. Hollander
                                                            United States District Judge

64